IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ASPEN SPECIALTY INSURANCE COMPANY, | } | |
| | } | |
| Plaintiff | ) | |
| | } | |
| vs. | } | CIVIL ACTION NO. H-05-0277 |
| | } | |
| MUNIZ ENGINEERING INC, *et al.*, | } | |
| | } | |
| Defendants | } | |

**MEMORANDUM AND ORDER**

Before the court are cross motions for summary judgment. The Defendant, Muniz Engineering Inc. (MEI), filed the first motion. Doc. 29. The Plaintiff, Aspen Specialty Insurance Company, f/k/a Dakota Specialty Insurance Company (Dakota), responded. Doc. 37. Dakota also filed its own motion for summary judgment. Doc. 31. MEI filed a response to Dakota's motion. Doc. 36. A third party defendant, JMG/IC Insurance Agency, Inc. (JMG/IC) filed a brief in support of MEI's motion for summary judgment. Doc. 38. The court considered each filing as well as the following documents:

- The insurance policy issued by Dakota to MEI. Doc. 31, Exh. A.
- The exclusion of classification or operation not listed. Doc. 31, Exh. J.
- The affidavit of Edelmiro Muniz, the founder of MEI. Doc. 29, Exh. B.
- Brandon Mark Blackmon's Second Amended Petition Intervention in Harris County Cause 2003-28750. Doc. 31, Exh. B.

- Plaintiffs' First Amended Original Petition in Harris County Cause 2003-28750. Doc. 31, Exh. C.
- The reservation of rights letter dated August 5, 2004 in which Dakota explained its belief that it had no obligation to defend MEI. Doc. 29, Exh. D.

Because locking out power sources and tagging out electrical lines is not an activity that the ordinary meaning of computer consulting or programming includes, the Plaintiff's motion is GRANTED. Doc. 31. For the same reason, the Defendant's motion is DENIED. Doc. 29.

**I. BACKGROUND**

Horace Mark Blackmon, an employee of C.F. McDonald Electric, Inc., was electrocuted while working on a generator on the grounds of NASA's Johnson Space Center in Houston, Texas. His death precipitated a lawsuit against a number of defendants, not including MEI. Doc. 31, Exh. C. Eventually, MEI was named as a defendant because several other defendants, "and/or Muniz had the duty to exercise reasonable care to protect workers … from dangerous conditions [and] the evidence will show that [the other defendants] and/or Muniz breached these duties." Doc. 31, Exh. B. at 4, § V. Specifically, these defendants "had the responsibility for locking out the power sources and tagging out the electrical lines." Id. at 3, § IV. MEI asked Dakota to fund MEI's defense pursuant to a commercial general liability policy (the policy) issued by Dakota to MEI. Dakota offered to defend MEI, but reserved the right to deny coverage. Doc. 29, Exh. D.

The policy requires Dakota to defend any suits arising from bodily injuries. However, through a circuitous path of references to declarations and exclusions, the policy did not cover bodily injuries that arise "from any classification or operation," other than "computer consulting or programming" or bodily injuries inflicted from "the rendering or failure to render any professional services." Doc. 31, Exh. A at 4 and 29, and Exh. J.

According to declarations attached to the policy, MEI is in the business of operating as a "computer consultant." Doc. 31, Exh. A at 3. Its job classification or operation was that of a "computer consultant or programmer." MEI's founder and CEO explained that MEI was "to perform computer based safety-related tasks at Johnson Space Center of NASA [and] to, among other things, collect, analyze, assess or proofread, and maintain safety data in NASA computer based information systems." Doc. 29, Exh. B, 3 and 4. However, no evidence before the court identifies what those "other things" might be.

In this lawsuit, Dakota seeks (1) a declaratory judgment absolving it of responsibility to defend MEI and (2) a money judgment against MEI for the costs of defending MEI. Dakota argues that its policy does not obligate it to defend MEI for two reasons. First, no reasonable interpretation of "computer consulting or programming" can possibly include "responsibility for locking out power sources and tagging out electrical lines." Second, MEI's negligence was a failure to render a professional service – *assuming* that "locking out power sources and tagging out electrical lines" was, in any way, actually computer consulting or programming.

MEI argues that the exclusions are not enforceable not only because they are ambiguous, but also because they render the contract illusory. MEI also argues that Dakota's failure to plead any exclusions specifically is fatal to its claim for relief and that Dakota has not presented evidence that "locking out power sources and tagging out electrical lines" falls outside the scope of "computer consulting or programming."

These arguments lead the court to determine (1) whether Dakota pled its case sufficiently; (2) whether the policy is illusory, and (3) whether the policy is ambiguous.

## II. LEGAL ANALYSIS

A party seeking summary judgment must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, showing that no genuine issue of material fact exists and explain why it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

In this case, the nature of the case limits the relevant facts to the undisputed contents of documents because, "[t]he duty to defend is determined by consulting the latest amended pleading" and the language of the policy. *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004) (citations omitted). When examining the pleadings, "[f]acts ascertained before suit, developed in the process of litigation, or determined by the ultimate outcome of the suit do not affect the duty to defend." *Id.* (citations omitted).

### A. DAKOTA PLEAD ITS CASE SUFFICIENTLY.

MEI notes that Dakota's complaint omits any reference to specific exclusions. Various cases decided by the appellate courts of Texas have applied two provisions of Texas law to require insurance companies to plead exclusions specifically. See, *Aetna Life & Cas. Ins. Co. v. Nuzum,* 551 S.W.2d 768, 770 (Tex. App.-Amarillo 1977, writ red'd n.r.e.). First, the rules of civil procedure provide:

> Where the suit is on an insurance contract which insures against certain general hazards, but contains other provisions limiting such general liability, the party suing on such contract shall never be required to allege that the loss was not due to a risk or cause coming within any of the exceptions specified in the contract, nor shall the insurer be allowed to raise such issue unless it shall specifically allege that the loss was due to a risk or cause coming within a particular exception to the general liability; provided that nothing herein shall be construed to change the burden of proof on such issue as it now exists.

Tex. R. Civ. P. 94.

This rule tracks a statutory provision:

> In any suit to recover under a contract of insurance, the insurer has the burden of proof as to any avoidance or affirmative defense that must be affirmatively pleaded under the Texas Rules of Civil Procedure. Any language of exclusion in the policy and any exception to coverage claimed by the insurer constitutes an avoidance or an affirmative defense.

Tex. Ins. Code, art. 21.58(b), repealed by Acts 2003, 78th Leg., ch. 1274, § 26(a)(1), eff. April 1, 2005.

Neither provision binds litigants in federal courts for two reasons. First, Dakota's request for declaratory judgment is not a "suit to recover under a contract of insurance." It is a suit to do precisely the opposite: to halt recovery under a contract. of insurance. Second, procedural rules enacted by states have not governed proceedings in federal court for more than sixty years. See, e.g., 28 U.S.C. § 2072; and *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). Instead, the Federal Rules of Civil Procedure require Dakota to do no more than file a pleading that contains, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Dakota has done so and MEI has not attempted to argue that Dakota's failure to file a more extensive pleading in any way affects substantive rights granted by the laws of Texas.[1]

**B. DAKOTA'S POLICY IS NOT ILLUSORY.**

MEI argues that Dakota's policy is illusory. The policy denies MEI any coverage for any activities that are not "computer consulting or programming" or that constitute "the rendering or

---

[1] Even if this court considered Dakota's pleadings deficient, the deficiency would have no impact on the practical outcome of the case. Because Dakota reserved its rights, a defective pleading inflicted no prejudice on MEI. In the absence of any prejudice to MEI, Dakota would be entitled to file an amended complaint to cure any deficiencies in the precise wording of its pleadings and the parties would return, eventually, to the positions in which they find themselves now.

failure to render any professional services." These exclusions, MEI believes, are so broad that the set of activities that the policy covers is empty. Dakota's response does not identify even a single occurrence that the policy would cover. Nevertheless, the exclusions are not as expansive as MEI argues and do require Dakota to cover certain occurrences.

The exclusion of any coverage for "the rendering or failure to render any professional services" means only that the policy does not provide malpractice insurance. For example, if MEI analyzed safety data negligently, then Dakota would not defend any resulting lawsuits. The coverage for activities constituting "computer consulting or programming" means that Dakota charged premiums for a computer consulting business, as opposed to a business in which injuries are inherently more likely to occur, such as maintaining electrical circuit breakers or power lines.

Even though Dakota declined to illustrate what occurrences the policy might cover, this court does not believe that the policy is illusory. The brief of third party defendant JMG/IC provides the most helpful illustration of an occurrence that might be covered. JMG/IC argued that a law firm's general liability policy would cover a lawyer who injures a pedestrian while driving to the courthouse. Brief in Support for Summary Judgment by JMG/IC, Doc. 38 at 7, 12. JMG/IG reasoned that, "although traveling is not typically within the defined activities of an attorney, traveling is a business operation [the attorney] completed for the financial gain of" the firm. Id. An attorney driving to court exemplifies an activity that is not a professional service, but is an activity within the job classification or operation of an attorney.

Similarly, computer consultants engage in certain activities that are not professional services. For example, a programmer who bumps a computer monitor onto another person would inflict an injury covered by the policy. Because the policy covers certain occurrences, however rare

or trivial, this court cannot hold that the exclusions are unenforceable because they render the policy illusory. At worst, MEI overpaid for its insurance.

**C. DAKOTA'S POLICY IS NOT AMBIGUOUS.**

Having determined that Dakota adequately plead its case and that its policy is not illusory, the policy and pleadings raises only a single remaining question: does the business of "computer consulting or programming" include the activity of "locking out power sources and tagging out electrical lines?"[2] MEI argues that the policy is ambiguous and that the pleadings creating the duty to defend "is silent as to whether MEI's alleged conduct arose out of or was related to computer consulting or programming." Response to Motion for Partial Summary Judgment, Doc. 36 at 16. Dakota responds by explaining that even the most liberal reading of "computer consulting and programming" cannot include "locking out power sources and tagging out electrical lines."

Answering this question and resolving the parties' dispute requires interpreting exclusions and declarations of the policy. In general, courts interpret insurance contracts like any other contracts. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). "The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d

---

[2] Dakota's professional services exclusion, although the focus of much argumentation, was only an alternative theory on which Dakota based its request for relief. Dakota did not argue that "locking out power sources and tagging out electrical lines" was a professional service. It did not attempt to argue, as JMG/IC believes, that the phrase "computer consulting and programming" is both broad and narrow. Brief in Support for Summary Judgment by JMG/IC, Doc. 38 at 7. Instead, it argued that *if* this court construes "computer consulting or programming" so broadly as to include "locking out power sources and tagging out electrical lines," then it should construe "locking out power sources and tagging out electrical lines" as a professional service. However, many work activities are not professional services and MEI appears to be correct when arguing that "locking out power sources and tagging out electrical lines" is not a professional service.

462, 464 (Tex. 1998). To determine the intent of the parties, "[t]erms in contracts are given their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning." *Greenwood Ins. Group, Inc. v. United States Liability Ins. Co.*, 157 S.W.3d 444, 448 (Tex.App.-Houston [1 Dist.], 2004) (citing *W. Reserve Life Ins. v. Meadows*, 261 S.W.2d 554, 557 (Tex. 1953)). However, courts construe exclusions strictly against insurers. *Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). Likewise, a court will adopt a reasonable interpretation of an insurance policy that favors the insured if the policy is ambiguous. *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997).

In this case, the policy excludes any occurrence that does not constitute "computer consulting or programming." Thus, this court must determine whether any reason exists to believe that the parties intended for the phrase "computer consulting and programming" to include "locking out power sources and tagging out electrical lines." In doing so, it must construe "computer consulting or programming" broadly to give the exclusion of activities other than "computer consulting and programming" the narrowest possible construction. However, the broadest possible construction of "computer consulting and programming" must not expand beyond the ordinary meaning of the term and the parties must present an interpretation of the policy that provides coverage.

In this case, MEI did not explain how any interpretation of "computer consulting and programming" could possibly include "locking out power sources and tagging out electrical lines." Likewise, the court interprets the phrase "computer consulting and programming" as unambiguously excluding activities described as "locking out power sources and tagging out electrical lines" even though it may be ambiguous with respect to whether some other activities fall within its scope.

Two authorities appear to articulate what this court believes is the ordinary meaning of "computer consulting and programming." First, MEI's CEO, Edelmiro Muniz, explained that in the course of "computer consulting and programming," MEI collected, analyzed, assessed, proofread, and maintained safety data in NASA computer based information systems. Doc. 29, Exh. B, 4. Second, a more specialized source, the Dictionary of Occupational Titles, defines a computer programmer as someone who:

> Converts data from project specifications and statements of problems and procedures to create or modify computer programs: Prepares, or receives from SYSTEMS ANALYST (profess. & kin.) 030.167-014, detailed workflow chart and diagram to illustrate sequence of steps that program must follow and to describe input, output, and logical operations involved. Analyzes workflow chart and diagram, applying knowledge of computer capabilities, subject matter, and symbolic logic. Confers with supervisor and representatives of departments concerned with program to resolve questions of program intent, data input, output requirements, and inclusion of internal checks and controls. Converts detailed logical flow chart to language processable by computer. Enters program codes into computer system. Inputs test data into computer. Observes computer monitor screen to interpret program operating codes. Corrects program errors, using methods such as modifying program or altering sequence of program steps. Writes instructions to guide operating personnel during production runs. Analyzes, reviews, and rewrites programs to increase operating efficiency or to adapt program to new requirements. Compiles and writes documentation of program development and subsequent revisions. May train workers to use program. May assist COMPUTER OPERATOR (clerical) 213.362-010 to resolve problems in running computer program. May work with SYSTEMS ANALYST (profess. & kin.) to obtain and analyze project specifications and flow charts. May direct and coordinate work of others to write, test, and modify computer programs.

Dictionary of Occupational Titles (DICOT) 030.162-010 (4th Ed. 1991).

However ambiguous the phrase "computer consulting and programming" may be, no definition of the terms or argument presented even suggests that even the widest interpretation of the phrase encompasses activities such as "locking out power sources and tagging out electrical lines." Instead, both the Muniz declaration and the Dictionary of Occupational Titles indicate that

"computer consulting and programming" is a sedentary and contemplative activity that does not relate to "locking out power sources and tagging out electrical lines." In the absence of any reason to believe otherwise, the court concludes that neither party to the policy intended for MEI's computer consultants and programmers to lock out power sources or tag out electrical lines. Consequently, the parties did not intend for Dakota to defend MEI in the suit currently pending against it.

## CONCLUSION

Because the case against MEI does not implicate its activities in the field of computer consulting or programming, the suit against it is excluded from coverage. Accordingly, it is hereby ORDERED that:

(1) The Defendant's Motion for Summary Judgment is DENIED. Doc. 29.

(2) The Plaintiff's Motion for Partial Summary Judgment is GRANTED. Doc. 31.

The Court finds that:

(a) DAKOTA issued to MUNIZ a commercial general liability policy, No. ZY-00GLTX00267 (the "Policy"), having the policy period July 15, 2002 through July 15, 2003;

(b) Though it did so after issuance of a Reservation of Rights letter, DAKOTA has provided a defense to MUNIZ, a defendant in *Brandon Mark Blackmon, Individually vs. C.F. McDonald Electric, Inc., d/b/a McDonald Electric, Gibane Building Company, Dyncorp Technical Services, L.L.C., and Muniz*

*Engineering, Inc.*, a lawsuit pending in the District Court of Harris County, Texas, Cause No. 2003-28750 ("The Underlying Lawsuit");

(c) Under the terms of the Policy, coverage for the claims asserted in the Underlying Lawsuit is excluded; it is therefore

**ORDERED** that DAKOTA is entitled to judgment for costs, reimbursement for the costs of defense expended to defend MUNIZ in the Underlying Lawsuit, and attorney's fees that were incurred in the prosecution of this suit and attorney fees for the appeal in the event of an appeal; such amounts are to be assesssed and determined in a separate motion pertaining to damages.

SIGNED at Houston, Texas, this 7th day of February, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE