**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ASPEN SPECIALTY INSURANCE }
COMPANY F/K/A DAKOTA }
SPECIALTY INSURANCE COMPANY }
      *Plaintiffs* }
v. }               CIVIL ACTION NO. H-05-0277
       }
MUNIZ ENGINEERING, INC. }
      *Defendants* }

## MEMORANDUM OPINION AND ORDER

      Plaintiff Aspen Specialty Insurance ("Aspen") sued Defendant Muniz

Engineering Inc. ("MEI") seeking a determination of their respective rights and liabilities under

an insurance policy issued by Aspen's predecessor, Dakota Specialty Insurance Company

("Dakota"). (Comp. ¶ 14 Dkt. 44.)  At issue was Aspen's duty to defend MEI in a state court

wrongful death action.  Aspen claimed it had no duty to defend based on an exclusion in the

policy for liability resulting from activities other than computer consulting.  The court granted

Aspen's motion for summary judgment, finding (1) that the policy excludes coverage for

liability arising from activities other than computer consulting and (2) that supervising lock out

tag out procedures on electrical systems is not an activity incident to computer consulting.  (*See*

Order Dkt. 45.)

      Prior to the court's ruling, MEI filed a third party complaint (Dkt. 11) against

JMC/IC Insurance Agency doing business as Insurance Concepts and William T. Baycroft

(collectively "Insurance Concepts").  Insurance Concepts acted as agent in procuring the

Dakota policy for MEI. MEI claims that the policy was inadequate and that therefore Insurance

Concepts is liable for its damages.  MEI states claims for negligence, violation of the Texas

Deceptive Trade Practices Act, violation of the Texas Insurance Code, negligent

misrepresentation, breach of fiduciary duty, and breach of contract. (Third-Party Compl. ¶¶ 15- 23 Dkt. 137.)

Pending before the court are Insurance Concepts' motion to dismiss and for summary judgment (Dkt. 74, 75). For the following reasons, the court ORDERS that Defendants' motion to dismiss is DENIED, Defendants' motion for summary judgment is GRANTED-in-part and DENIED-in-part.

I. Facts

MEI was formed in 1992 by Lt. Col. Edelmiro Muniz ("Muniz"), a retired member of the United States Air Force. (Muniz Aff. ¶ 3 Dkt. 90 Ex. A.) At the time, MEI helped large contractors tailor their bids to the government. (*Id.*) MEI's primary services were marketing, bid and proposal support, and engineering analysis. (*Id.*)

MEI grew quickly. It was formed with one full-time employee, Muniz, a part-time employee and an independent contractor. (*Id.* ¶ 4.) By the mid-1990s, the company had grown to nearly 100 employees. (*Id.*) By 2001, it had approximately 250 employees. (*Id.*) Today, it has approximately 700 employees. (*Id.*) The company expanded its services as it grew. In 2002, MEI's business included technical and administrative services; contract support services, such as ground safety support; and other services related to engineering projects. (*Id.* ¶ 14.) Its clients included government agencies such as NASA and other companies in the aerospace industry. (*Id.*)

Soon after forming MEI, Muniz approached Baycroft for insurance. (Muniz Aff. ¶ 5.) Baycroft testified that MEI's business came to him on the recommendation of a mutual acquaintance, Muniz's secretary. (Baycroft Depo. 90:17-23 Doc. 90 Ex. B.) Baycroft did not "recall the exact conversation" he had, or who he had it with, but was sure that he indicated that he "could provide workers' compensation, general liability" insurance, i.e., "the normal for a startup company." (*Id.* 93:13-19.).

Baycroft testified that, according to his business practice, he would complete an application for insurance with a representative of the business seeking insurance (Baycroft Depo. 59:4-24.), then he would present that information to the market place, i.e., to underwriters who analyze companies and issue insurance policies.  (*Id.* 147:23-25; *see also* King Depo. 94:4-8 Dkt. 74 Ex. 5.)  Insurance Concepts would repeat this process each year during the renewal period.  Specifically, Baycroft would discuss documents called "renewal reviews" with clients, reviewing all the information in the system including the prior application.  (Baycroft Depo. 89:14-90:4.)  Then Baycroft would return to the market place to procure a new insurance policy on his client's behalf.

Peggy Bristow ("Bristow") was in charge of "interfac[ing] with the William T. Baycroft and later Insurance Concepts Insurance Agency … the insurance agents to whom [MEI] outsourced the responsibility for its insurance needs."  (Bristow Aff. ¶ 4 Doc. 90, Ex. C.)  It was her responsibility to provide "the information requested by [MEI's] agents in initially securing insurance coverage on behalf of [MEI]." (*Id.* ¶ 5.)  Later, she would provide "information requested by [MEI's] during the annual 'renewal review'" and participate "in the 'proposal meeting' conducted each year during which Mr. Baycroft explained the coverages being proposed to [MEI]." (*Id.*)  She would review the policies to determine whether they listed the proper amounts, locations, and entities, but relied on the expertise of Baycroft and Insurance Concepts to select the proper terms and conditions and "did not review the actual forms, terms, and conditions contained in the policies[.]" (*Id.*)  She does not recall that the business classification of "Computer Consultant" was ever discussed with her.  (*Id*. ¶ 6.)

In 1998, Donna Lancon ("Lancon") assumed Bristow's duties.  (Lancon Aff. ¶ 2 Doc. 90 Ex. D.)  Like Bristow, Lancon provided information about MEI's business to Insurance Concepts and attended meetings at which Baycroft would propose the policies for the coming year.  (*Id.* ¶ 3.) Like Bristow, Lancon did not review the terms of the policies, but instead relied on Baycroft's expertise in selecting policies for MEI.  (*Id.*)

3

In addition to obtaining the general commercial liability policy, Bristow and Lancon also obtained certificates of insurance for various contracts that MEI performed. (Bristow Aff. ¶ 7; Lancon Aff. ¶ 4.)  To obtain these insurance certificates, they transmitted descriptions of the work to be performed to Insurance Concepts. (*Id.*)  In a "certificate of liability insurance" dated July 12, 2002, Baycroft certified that MEI held liability insurance through Dakota. (Certificate of Liability Insurance Dkt. 74 Part 4 Ex. 9 p. 32.)  The certificate describes MEI's operations as "ground safety contract w/JSC," i.e., the Johnson Space Center. A second certificate described MEI's work as "engineering work."  (Certificate of Liability Insurance Dkt. 74 Part 4 Ex. 9 p. 34.)

Between July 15, 2001 and July 15, 2002, MEI held a commercial general liability policy (Dkt. 97 Ex. 4) issued by United National Insurance Company.  The policy describes MEI as a "Computer Consultant."  (*Id*. 1.)  It, like the later Dakota policy, excludes coverage for any liability arising from professional services and includes the SL-6 exclusion for  "classification or operations not disclosed."  (*Id*. 2.)  The SL-6 exclusion does not list any specific classification or operations, but incorporates the declarations on page one of the policy. Therefore, it excludes coverage for any activity other than computer consulting.

On March 5, 2002, Carol King ("King"), of Insurance Concepts, contacted MEI about renewing its general liability policy. (Letter Dkt. 74 Ex. 6).  She requested information about any changes in MEI's business, and if there were none, promised to "proceed with the renewal based on our current information."  (*Id.*)  Lancon denies that anyone asked her to provide a description of the scope of MEI's business during the renewal and review process. (Lancon Aff. ¶ 5.)  Instead, she claims she spoke with King over the telephone and provided information related to MEI's payroll and a list of locations at which MEI was performing work. (*Id.*)  She denies making any changes to MEI's classified business activities (*Id.*) and avers that she believed Baycroft understood MEI's business because he commented on the awards the

company had received, the types of contracts MEI had been awarded, and MEI's recent growth in revenue and employees.  (Lancon Aff. ¶ 6.)

Lancon testified she delivered copies of MEI's marketing materials, such as brochures and PowerPoint presentations, describing MEI's operations.  (*Id.* ¶ 7.)  These brochures describe MEI as engaging in operations that are far more diverse than computer consulting or programming.  (Dkt. 91, Ex. O.)  In fact, the website that MEI used in 2001 did not describe itself as a computer company, but as an "engineering company that provides engineering, safety and product assurance, and information technology and management services[.]" (*Id.* #1068.)  On the same website, MEI described its capabilities as including "engineering services" such as "spacecraft systems engineering and design, shuttle payload integration and operations, launch vehicle and payload integration, developmental and operational test evaluation, structural engineering;" "safety and product assurance" such as "mission safety, industrial safety, reliability, risk management;" and "information technology and management" such as "software/graphics program development, configuration management, program management support."  (*Id.* #1079.)  MEI's website, as it appeared in 2002, described its business in similar language:  "Muniz Engineering, Inc. is a Houston based engineering company that provides engineering, safety and product assurance, and information technology and management services to government and industry."  (*Id.* #1084.)

Despite having this information at its disposal, the application for insurance submitted to Dakota by Insurance Concepts (Dkt. 91 Part 5 Ex. J) describes MEI's "scope of operations" as follows:

> Engineering via computer.  Involving programming and data entry.  A small division also consults on computer systems.  They also consults [sic] on computer systems.  They find out what the client needs the computer to do then they recommend the hardware, order it and install it in the clients [sic] office. They also provide technical support, upgrades, maintenance etc.  This division is very small.  The insured's primary customer is the government ie [sic] NASA, Air Force.  They do have a commercial contract with Levi in New Mexico and are actively pursuing more in Texas, New Mexico, and Colorado.  In 1995, the

5

> insured had more than 80 employees.  They currently have about 56.  The
> estimated payroll contemplates them building back up.

This information was current in 1996 when MEI had 56 employees, but not in 2002 when MEI

had 250 employees.  (Muniz Aff. ¶ 4.)

On July 5, 2002, Insurance Concepts received a quote for commercial general

liability coverage through Dakota from Milton O. Johnston and Company. (Quote Dkt. 91 Part

6 Ex. L.)  The quoted policy cost approximately $33,000.00, provided a 12.5% commission for

Insurance Concepts, and included the SL-6 exclusion for operations not listed. (*Id*.)

On July 12, 2002, without consulting MEI, Insurance Concepts agreed to the

quoted coverage offered by Dakota. (*See* Dakota Commercial Lines Policy Dkt. 106 Part 5 Ex.

4.)  Accompanying the Policy was a letter (Dkt. 91 Part 9 Ex. M.) asking Insurance Concepts to

"review the policy in its entirety to determine that coverages are acceptable," and instructing it

to, "[i]f everything is correct … forward the original to the insured immediately." (*Id*.)

Insurance Concepts did not, however, immediately forward the policy to MEI.

On July 15th, Baycroft presented MEI with an Insurance Proposal (Dkt. 74, Ex.

4). The first two pages of the proposal describe the services Insurance Concepts provides,

explaining that "Every account has an account management team to provide advice and counsel

on your insurance program" (*Id*.) and going on state that "[o]ur close relationship with the

client and the carriers" allows Insurance Concepts "to present the client accurately and

favorably to the marketplace." (*Id*.)  Despite the representations made by Insurance Concepts

in its application, on MEI's behalf, for general commercial coverage, the proposal indicates

that Insurance Concepts knew that MEI's total payroll had increased by over 50%. (*Id*.)

Page nine of the proposal discusses Insurance Concepts's recommended

commercial general liability coverage.  The first heading, "Description Of Coverage," provides:

"Commercial General Liability protects against Legal Liability arising from injuries to third

parties as a result of the operations of the insured except from the operations of an automobile

and aircraft." (*Id.* 9.)  The third heading on the page, "Terms, Conditions, Exclusions and Limitations," lists the following exclusions: terrorism, war, asbestos and silica, professional liability, punitive and exemplary damages, employment related practices, assault and battery, Year 2000 and other computer related problems, and mold.  The proposal does not list or explain the SL-6 exclusion for operations other than computer consulting.  The only time the words computer consulting appear in the proposal is on the following page, where they appear beneath the locations covered by the policy.

Muniz testified that, at the presentation, Baycroft explained that all of MEI's operations would be covered by the commercial general liability policy except for any operation of airplanes or automobiles. (Muniz Aff. ¶ 14.) According to Muniz, Baycroft did not describe the SL-6 exclusion for operations not listed. (*Id.*)

MEI agreed to the policy after the meeting.  The policy itself, however, was not delivered to MEI until September 18, 2002. (Muniz Aff. ¶ 17.)  The Policy was in effect from July 15, 2002 to July 15, 2003.  As explained above, because of how the exclusion interacted with other portions of the Policy, such as the Declarations page, the Policy covered only those activities of MEI that were computer consulting or programming, but did not cover liability for the provision of professional services.

On August 29, 2002, between the day on which Baycroft described the terms and effect of the policy and the day on which he delivered the actual policy to MEI, Horace Mark Blackmon was electrocuted at NASA's Johnson Space Center ("JSC").  At the time, MEI was working at the JSC under a contract to provide safety and fire services.  Specifically, Muniz testified at his deposition that MEI "ha[s] a contract with NASA that's safety related.  To the extent that we observe a hazard or hazardous operation going on we have an obligation to point out the hazard in cases where we believe that property or human lives could be in danger." (Muniz Depo. 143:4-18;152:12-18 Dkt. 106, Ex. 1.)  As a result of Horace Mark Blackmon's death, Teresa Lynn Blackmon filed suit in Harris County District Court.  She did not name MEI

as a defendant.  Later, on February 20, 2004, Brandon Mark Blackmon filed a First Amended
Petition in Intervention which named MEI as a defendant.  MEI asked Dakota to defend it
against the Blackmons' suit.  Aspen defended MEI until this court held that it had no duty to do
so.

II. Law

      *A. Dismissal Standard Under Rule 12(b)(6)*

      A motion to dismiss under Rule 12(b)(6) is "viewed with disfavor and is rarely
granted."  *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th
Cir. 1982).  A court dismisses a complaint under Rule 12(b)(6) only  when "it appears beyond
doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him
to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46(1957).  "The question therefore is whether in
the light most favorable to the plaintiff and with every doubt resolved in his behalf, the
complaint states any valid claim for relief."  5A CHARLES A. WRIGHT & ARTHUR R. MILLER,
FEDERAL PRACTICE AND PROCEDURE § 1357 (2nd ed. 1990).  A plaintiff must, however, assert
more than general legal conclusions to avoid dismissal.  *Jefferson v. Lead Industries Assoc.,
Inc.,* 106 F.3d 1245, 1250 (5th Cir. 1997). "[T]he complaint must contain either direct
allegations on every material point necessary to sustain a recovery. . . or contain allegations
from which an inference fairly may be drawn that evidence on these material points will be
introduced at trial."  *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting
3 WRIGHT & MILLER FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 1216 at 156-159).  Where a
complaint asserts merely conclusory allegations, these conclusory allegations and unwarranted
deductions of fact are not admitted as true. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th
Cir.1992). Second, where a complaint shows on its face that it is barred by an affirmative
defense, a court may dismiss the action for failing to state a claim. *Kaiser Aluminum*, 677 F.2d
at 1050.

In considering a Rule 12(b)(6) motion to dismiss a district court may review the pleadings on file, *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000), and matters of public record. *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995). "Pleadings on file" includes "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [its] claim." *Collins*, 224 F.3d at 498-99.

   *B. Summary Judgment Standard.*

The movant seeking a federal summary judgment initially must inform the court of the basis for his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine issue of material fact and show that he is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant need not negate the opposing party's claims nor produce evidence showing an absence of a genuine factual issue, but may rely on the absence of evidence to support essential elements of opposing party's claims. *International Assoc. of Machinists & Aerospace Workers, Lodge No. 2504 v. Intercontinental Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987).  The burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial.  Fed. R. Civ. P. 56(c).  The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence and specific facts.  *Anderson*, 477 U.S. at 256-57.  He meets this burden only if he shows that "a reasonable jury could return a verdict for the non-moving party."  *Id.* at 254.  A mere scintilla of evidence will not preclude granting of a motion for summary judgment.  *Id.* at 252.

All reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574. 587-88 (1986), citing *United States v. Diebold*, 369 U.S. 654, 655 (1962).  Once the burden of proof has shifted to the non-movant, he "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586.  Instead he must produce evidence upon which a jury could reasonably base a verdict in his favor.  *Anderson*, 477 U.S. at 249.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.*, 477 U.S. at 249-50.  Moreover the non-movant must "go beyond the pleadings and by her own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.*, 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions are not competent summary judgment evidence.  *Grimes v. Texas Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Texas Tech University*, 80 F.3d 1042, 1046 (5th Cir. 1996), *citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(*en banc*). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the district court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment.  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998), *citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).

   B. *Standard for applying state law.*

This case is governed by Texas law.  When a state's law governs a case heard by a federal court, that federal court must follow not only statutes passed by the state's legislature, but also the law as explained by the state's highest court.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Thus, decisions of the relevant state's highest court bind a federal court.  *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940).  "When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide."  *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992).  To determine what the highest court of the state would decide, a federal court should analyze:

> (1) decisions of the [Texas] Supreme Court in analogous cases, (2) the rationales and analyses underlying [Texas] Supreme Court decisions on related issues, (3) dicta by the [Texas] Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of courts of other states to which [Texas] courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries.

*Centennial Ins. Co. v. Ryder Truck Rental, Inc.*, 149 F.3d 378, 382 (5th Cir. 1998) (citations omitted).

No matter how a federal court analyzes these seven factors, it still may not "adopt innovative theories of" state law, but must "apply that law as it currently exists."  *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1217 (5th Cir. 1985).  If a state's law is to be changed, "[i]t is up to the Supreme Court of [that state] and not [a federal] court to change … substantive law," even though a party "cites … many scholarly criticisms of the rule" at issue.  *Cargill, Inc. v. Offshore Logistics, Inc.*, 615 F.2d 212, 215 (5th Cir. 1980).  Thus, a federal court must apply state law cautiously.

*C. Insurance Agent Liability in Texas.*

Under Texas law an insurance agent can be liable to the insured for negligence, breach of contract, and violation of statutory duties under both the Deceptive Trade Practices Act and the Insurance Code.

### 1. *Negligence*

"It is established in Texas that an insurance agent who undertakes to procure insurance for another owes a duty to a client to use reasonable diligence in attempting to place the requested insurance and to inform the client promptly if unable to do so." *May v. United Services Association of America*, 844 S.W.2d 666, 669 (Tex. 1993). In this regard, plaintiff must establish his reasonable reliance on the agent's promise to procure the requested insurance. *Id.* In other words, liability will usually depend on evidence that the agent has induced his client to rely on his or her performance and that the client reasonably, but to his detriment, assumed that he was insured against the risk which caused the loss. *See Moore v. Whitney-Vaky Ins. Agency*, 966 S.W.2d 690, 692 (Tex. App. – San Antonio 1998) (finding no liability where insured never requested specific type of coverage, agent provided policy in accordance with his understanding of insured's expectations, and agent never discussed contents of policy or said anything to give the impression to the insured that the policy would cover all lawsuits against him). Whether an Insurance Agent can be liable for procuring an objectively inadequate insurance policy has yet to be decided by the Texas Court Supreme Court. In *May*, however, the Court suggested its amenability to such claim. *May,* 844 S.W.2d at 671 n. 13.

An insurance agent may not misrepresent an insurance policy's terms. *Rainey-Mapes v. Queen Charters, Inc.*, 729 S.W.2d 907, 913-14 (Tex.App.-San Antonio 1987). Also, if an agent is acting on behalf of the insured, he is under a duty to explain the application for insurance and the terms of the coverage being applied for. *North Am. Shipbuilding v. Southern Marine & Aviation Underwriting*, 930 S.W.2d 829, 836 (Tex. App. 1996); *McNeill v. McDavid Ins.*

*Agency,* 594 S.W.2d 198, 203 (Tex. App.– San Antonio 1980) ("we decide that when the agent of an applicant agrees to apply for insurance on behalf of the principal, the agent has the duty to either explain the terms of the application form, or otherwise inform the principal what coverages are included in the application."). Other duties most likely depend on the course of dealings between agent and insured.  *See McCall v. Marshall*, 398 S.W.2d 106, 109 (Tex. 1965) (declining to hold agent liable for failing to extend the insurance protection of his customer . . . "in the absence of evidence of prior dealings where the agent customarily has taken care of his customer's needs without consulting him."); *see also Trinity Universal Ins. Co. v. Burnette*, 560 S.W.2d 440, 442-43 (Tex. App. – Beaumont 1977) (agent liable where agent had practice of always renewing policies for his clients or notifying them when the policies were not renewed).

Despite these duties, an insured is not without responsibility in his dealings with an agent.  An insurance agent has no duty to explain an insurance policy's terms, and an insured has a duty to read and be familiar with the terms of his own policy and is bound to them whether he has read them or not. *Heritage Manor of Blaylock Properties, Inc. v. Petersson*, 677 S.W.2d 689, 691 (Tex. App. – Dallas 1984)

### 2. *Contract*

In addition to tort liability, failure to procure the requested insurance may give rise to liability for breach of contract. *See Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex.App.-Tyler 2004) (reversing and remanding for trial on whether insurance agent breached contract with insured); *see also Turner-Bass Assoc. v. Williamson*, 932 S.W.2d 219, 222 (Tex. App. – Tyler 1996).

### 3. *Breach of Fiduciary Duty*

Texas does not recognize the relationship between insurance agent and client as a formal fiduciary relationship.  This leaves open the possibility that, under the facts of a particular case, a confidential relationship might be found.  "[C]onfidential relationships may arise where one

person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593 (Tex. 1992).  In *Crim Truck & Tractor Co*, plaintiff franchisees obtained a jury verdict against defendant franchisor for breach of contract, breach of fiduciary duty and fraud.  The Court of Appeals reversed finding, *inter alia*,  no evidence of a confidential relationship. Affirming, the Texas Supreme Court held that there was no evidence of a confidential relationship under the facts of the case.  The Court noted that, particularly in the business arena, trust and reliance alone are not sufficient to create a confidential relationship, for "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *Id.* at 594. "Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship." *Id.* at 595. Rather, a confidential relationship exists only where "one party is in fact accustomed to being guided by the judgment or advice of the other, or is justified in placing confidence in the belief that such party will act in its interest." *Thames v. Johnson*, 614 S.W.2d 612, 614 (Tex. Civ. App.– Texarkana 1981).

### 4. *Liability under the Texas Insurance Code and the DTPA*

Agents are "persons" engaged in the business of insurance for the purposes of the Insurance Code.  Tex. Ins. Code § 541.002(2).  The Texas Insurance Code prohibits, *inter alia*, any misrepresentation of the terms of a policy or the benefits or advantages promised by the policy.  Tex. Ins. Code § 541.051.  This includes: "failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made." Accordingly, insurance agents have been found liable under this statute's predecessor, Art. 21.21, for misrepresenting the scope or existence of coverage.  *See e.g. Rainey-Mapes*, 729 S.W.2d 907, 913-14 (finding agent liable for failure to disclose exclusion in policy); *see also Hope v. Allstate Ins. Co.*, 719 S.W.2d 634, 636-37 (Tex. App. –

Fort Worth 1986) (agent liable for representing that "we got you covered" when policy was not in place).

The Texas Deceptive Trade Practices Act ("DTPA") expressly incorporates Chapter 541 of the Texas Insurance Code. Tex. Bus. & Com. Code § 17.50.  Aside from making actionable any violation of Chapter 541, the DTPA also makes it unlawful for any person to engage in a laundry list of activities. *See* § 17.46 (Deceptive Trade Practices Unlawful).   Particularly relevant to this case are that section's prohibitions on (1) "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," § 17.46(b)(12), and (2) "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed"§ 17.46(b)(24).  Despite this seemingly broad language, several Texas Courts have found that a plaintiff must show a specific misrepresentation by the insurance agent to recover under either Statute. *See Moore v. Whitney-Vaky Ins. Agency*, 966 S.W.2d at 690; *Sledge v. Mullin*, 927 S.W.2d 89, 90 (Tex. App.– Fort Worth 1996).

III. <u>Application of Law to the Facts.</u>

MEI's complaint against Insurance Concepts states claims for (A) negligence, (B) violation of the DTPA, (C) violation of the Texas Insurance Code, (D) negligent misrepresentation, (E) breach of fiduciary duty, and (F) breach of contract.  Insurance Concepts argues that each of these causes of action is either legally or factually inadequate.  Insurance Concepts addresses some of MEI's causes of action in its motion to dismiss and others in its motion for summary judgment, both filed the same day. This division appears to be prompted by a mistaken belief that legal insufficiency should be addressed in a motion to dismiss pursuant to Rule 12(b)(6) and factual insufficiency should be addressed in a motion for summary

judgment under Rule 56.  The court does not believe that this distinction is imposed by the Federal Rules of Civil Procedure, which provide in Rule 56(c) an efficient means of assessing both factual and legal sufficiency.  Therefore, the court will consider all of Defendant's arguments in the context of its motion for summary judgment.  Accordingly, Defendants' motion to dismiss (Dkt. 75) is DENIED.

### A. Negligence

MEI alleges eighteen acts or omissions it believes give rise to liability.  It argues that Insurance Concepts was negligent because it:

(a)     "fail[ed] to properly procure insurance for MEI;

(b)     "fail[ed] to act as a reasonable and prudent agent would have under the same or similar circumstances;

(c)     "fail[ed] to ensure MEI would have proper insurance coverage afforded for any loss arising out of its operations other than computer consulting;

(d)     "allow[ed] the policy coverage requested to differ from those proposed and explained to MEI without advising MEI;

(e)     "fail[ed] to disclose that the Policy's coverage of MEI's operations did not include its operations other than computer consulting or programming;

(f)     "fail[ed] to properly explain the terms and conditions of the insurance contract;

(g)     "fail[ed] to properly procure insurance, including for MEI's operations other than computer consulting or programming;

(h)     "allow[ed] the appearance of insurance coverage to exist that insurance coverage was afforded for any loss resulting from MEI's operations, including operations other than computer consulting or programming;

(i)     fell "below the standard of care of an insurance agent;

(j)     "fail[ed] to advise, explain, or disclose the insurer's insurance Policy coverages;

(k)     "fail[ed] to provide insurance coverage for MEI's operations other than computer consulting or programming;

(l)     "fail[ed] to disclose to MEI that its operations other than computer consulting or programming are excluded under the Policy;

(m)   "fail[ed] to understand the operations and insurance needs of MEI;

(n)   "fail[ed] to fully and accurately fill out the insurance application and convey to the insurance company the necessary information to protect the needs of MEI;

(o)   "fail[ed] to maintain information  provided them regarding MEI in such a way as to be able to use that information to accurately present MEI to insurers in soliciting coverage;

(p)   [omitted]

(q)   "fail[ed] to use information in their possession to select a business description or premium classification code that accurately reflected MEI's operations;

(r)   "in not knowing and understanding that certain provision of the Policy excluded from coverage certain of MEI's operations, and failing to disclose to MEI the impact of these provisions as a reasonable and prudent agent would have; and

(s)   "fail[ed] to disclose to MEI that it believed coverage under the Policy to be ambiguous or illusory."

(Compl. ¶ 15.)  Insurance Concepts has challenged each of these breaches individually. Common themes, however, tie together Insurance Concepts' objections, and the court will address them in terms of MEI's negligence claim as a whole.

The breaches MEI alleges can be grouped into several overlapping categories.  First, are claims that Insurance Concepts failed to procure the policy requested. *See May*, 844 S.W.2d at 669.  These are claims (a), (b), (c), (d), (g), (i), and (k).  Second, are claims that Insurance Concepts failed to use "reasonable diligence" in procuring the policy. *See Id.* These are claims (a), (b), (c), (d), (g), (i), (k), (m), (n), (o), (q), and (r).  Third, are claims that Insurance Concepts misled MEI about the terms of the policy. *See Rainey-Mapes*, 729 S.W.2d at 913-14. These are claims (b), (d), (e), (h), (i), (j), (l), (r), and (s). Finally fourth, are claims that Insurance Concepts failed to explain the terms of the coverage being proposed.  *See McNeill*, 594 S.W.2d at 203. These are claims (b), (f), (i), (j), (l), (r), and (s).

17

Insurance Concepts bases its argument on three propositions of law: (1) that an insured has a duty to read the policy and will be charged with knowledge of its terms, *Heritage Manor*, 677 S.W.2d at 691; (2) that an insurance agent does not have a duty to explain a policy's terms, *Id.*; and (3) that an insurance agent has no duty to extend an insured's coverage, *McCall*, 398 S.W.2d at 109. (Mot. Dismiss ¶ 11.)  While accurate, these propositions do not apply to the facts of this case.

As to the duty to read, MEI has introduced evidence that it did not receive a copy of the Dakota policy from Insurance Concepts until after the accident that is the basis of this suit. (Muniz Aff. ¶ 17.)  MEI had no duty to read a policy it did not have.  Insurance Concepts argues, however, that the Dakota Policy was simply a renewal and therefore MEI should be charged with knowledge of its terms. This argument is not convincing.  Despite Insurance Concepts characterization of the policy as a renewal, it is clear from the document that it is a separate legal agreement binding coverage with a different insurer, United National Insurance Company.  At most, the fact that the SL-6 exclusion was contained in the earlier policy raises an issue of comparative negligence. *See* Tex. Civ. Prac. & Rem. Code § 33.002(a)(1) - § 33.003.

As for MEI's claims regarding Insurance Concepts' failure to explain and disclose the terms of the proposed coverage, they fall squarely in the ambit of *Northern Am. Shipbuilding* and *McNeill*.  Both of these cases recognize that when an agent has agreed to act for a client in applying for insurance, the agent has a duty to inform the client of what coverages are included. *Northern Am. Shipbuilding* at 836; *McNeill* at 202-03. *Heritage Manor*, on which defendant relies, is distinguishable because in that case, as in *Moore*, the insured had been supplied with a copy of the policy and failed to read it.

Finally, Insurance Concepts' extension of coverage argument is unconvincing.  MEI's claim is that Insurance Concepts failed to procure the requested coverage, i.e., commercial

liability coverage for the business as a whole, not that it failed to extend MEI's pre-existing coverage or apply for new unsolicited coverage.

In addition to its legal arguments, Insurance Concepts makes several fact based challenges to MEI's negligence claim.  Insurance Concepts argues that it is entitled to judgment as a matter of law because it procured a general commercial liability policy, thereby discharging its duties.  (Mot. Summ. J. ¶ 9.)  Despite its simplicity, this argument is unconvincing. At the very least the law requires the procured policy to have some resemblance to what the client requested.  The policy procured by Insurance Concepts insured just a small fraction of MEI's business.  MEI claims it requested and was offered a general commercial liability policy covering all its operations. (Muniz Aff. ¶ 14.).  Whether this was the case is a jury question.

Insurance Concepts' second claim is that two disclaimers in the proposal provided to MEI are independently dispositive of its claim that it did not know the terms of the policy as compared to the proposal.  (Mot. Summ. J. ¶ 12.)  The first disclaimer is contained on the last page of the proposal and states: "[i]t is understood that this proposal provides only a summary of the details; the policies will contain the actual coverages." (Proposal final page.)  The second disclaimer is in the section discussing general liability coverage and states: "General Liability Policy includes but is not limited to the following terms, conditions, and/or exclusions."  It goes on to list terrorism, war, asbestos and silica, professional liability, punitive and exemplary damages, employment related practices, assault and battery, Year 2000 and other computer related problems, and mold. (Proposal 9.)  Taken together, these disclaimers would have placed the reasonable reader on notice of his duty to read the actual policy.  MEI, however, has introduced evidence that it did not receive the policy from Insurance Concepts until after the accident occurred. (Muniz Aff. ¶ 17.) Insurance Concepts cannot depend on its own failure to deliver the policy promptly as a basis for escaping liability.

Insurance Concepts' third argument is that it cannot be liable for failing to accurately describe MEI's business on its insurance application because the information contained on the application came originally from MEI. (Mot. Summ. J. ¶ 24.) This argument fails because MEI has submitted evidence that it was never consulted about how its scope of operations would be presented to the marketplace. (Muniz Aff. ¶ 14; Bristow Aff. ¶ 6; Lancon Aff. ¶ 6.)  This is a contested issue of fact to be determined by the jury.

Insurance Concepts' final argument is that MEI was on notice that Insurance Concepts was depending on it to provide more information on its scope of operations and that MEI should have know that Insurance Concepts believed MEI's scope of operations to be computer consulting.  (Mot. Summ. J. ¶¶ 23, 24.)  This argument raises, at most, an issue of comparative negligence that must be weighed by a jury. *See* Tex. Civ. Prac. & Rem. Code § 33.002(a)(1) - § 33.003.

### B. Violation of the DTPA

MEI alleges Insurance Concepts violated the DTPA by:

(a)       "representing that the Policy issued to MEI confers rights, remedies and obligations which in fact the Policy [did] not confer;

(b)       "representing that goods or services sold to MEI, specifically the Policy, have sponsorship, approval, characteristics, ingredients, uses, benefits or qualities which the Policy does not have;

(c)       "failing to disclose information concerning services, or goods which was known or should have been known at the time of the transaction and such failure to disclose such information was intended to induce MEI into transaction into which MEI would not have entered into had the information been properly disclosed;

(d)       "withholding material information concerning coverage for MEI's operations other [than] computer consulting or programming; and

> (e)    "engaging in unconscionable conduct by selling an insurance policy under which they believe[d] coverage under the Policy to [have been] ambiguous or illusory."

(Compl. ¶ 17.)

Insurance Concepts argues that MEI's DPTA claims should be dismissed as a matter of law because (1) MEI had a duty to read the policy, (2) Insurance Concepts' services were exempt professional services, Tex. Bus. Comm. Code § 17.49(c), and (3) MEI did not pay Insurance Concepts for its services. (Mot. Summ J. ¶ 27-32.) Additionally, Insurance Concepts argues that MEI's claim for unconscionable conduct has been conclusively disproved by Baycroft's affidavit testimony that he did not believe coverage to be illusory.  The court will consider each argument in turn.

Insurance Concepts' first argument, that MEI had a duty to read the policy, has already been discussed in the context of MEI's negligence claim. MEI has introduced evidence that Insurance Concepts did not provide it with a copy of the policy until after the accident. (Muniz Aff. ¶ 14.)  As previously noted, MEI did not have duty to read what it did not have.

Insurance Concepts' second argument, that it is exempt under Section 17.49(c), requires the court to examine the "essence" of the relationship between MEI and Insurance Concepts. Section 17.49(c) provides "[n]othing in this subchapter shall apply to a claim for damages based on the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill." In its pleadings and summary judgement evidence, MEI repeatedly characterizes Insurance Concepts' services as including the rendering of advice, judgment, opinion, or similar professional skill. (*See e.g.* Muniz Aff. ¶ 8.) The court therefore finds that Insurance Concepts was rendering professional services to MEI.  Section 17.49(c) is subject to three relevant exceptions: Sections 17.49(c)(1), (2) and (3).  These sections provide that the professional services exemption does not apply to "(1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or

opinion;" "(2) a failure to disclose information in violation of section 17.46(b)(24);" and "(3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion." In this case, claims (a), (b), (c) and (e) are subject to these exceptions. Claim (d) is not.

Insurance Concepts' third argument, that the consumer transaction element of MEI's claim fails because Insurance Concepts was paid by the insurer, is directly contrary to the Texas Supreme Court's holding in *Kennedy v. Sale*, 689 S.W.2d 890 (Tex. 1985). In that case, plaintiff sued defendant insurance agent under the DTPA for misrepresenting the terms of an insurance policy. *Id.* at 891. The jury rendered a verdict for plaintiff, but the court of appeals reversed, finding that because plaintiff had not purchased the policy benefits directly from the agent he was not a consumer under the DTPA. The Texas Supreme Court reversed the court of appeal's ruling and affirmed the judgment of the trial court. *Id.* at 893. It held that, under the facts of the case, plaintiff was a consumer entitled to bring a claim under the DTPA. *Id.* at 892. Importantly, the Court observed that a person may "acquire" a good or service through the "purchase or lease" of another. *Id.*

Insurance Concepts' fourth argument, that MEI's claim for unconscionable conduct is conclusively disproved by Baycroft's affidavit testimony, is unconvincing. (Dkt 74, Ex. 8.) MEI has introduced evidence that Baycroft knew the true scope of MEI's operations and knew that they would not be covered under the Dakota policy. That Baycroft disagrees does not mean he is entitled to summary judgment. What Baycroft knew or believed at the time he proposed the policy to MEI is a fact question for the jury.

### C. Insurance Code

Insurance Concepts makes two arguments why it is entitled to judgment as a matter of law on MEI's Insurance Code Claims. They are (1) that causation and reliance fail because MEI is deemed to know the contents of the insurance policy, i.e. that MEI had a duty to read the

policy; and (2) that other courts in other cases have dismissed Insurance Code claims against insurance agents.  (Mot. Summ. J. ¶¶ 34, 35, 36 *citing Moore*, 966 S.W.2d at 992 and *Sledge*, 927 S.W.2d at 94.) Insurance Concepts' first argument has already been addressed several times and will not be revisited.  As for its second argument, Insurance Concepts makes no effort to articulate why the cases it cites are analogous to this one.

### D. Negligent Misrepresentation

Insurance Concepts argues that MEI's negligent misrepresentation claims must be dismissed as a matter of law because MEI had a duty to read the policy and because statements made by insurance agents concerning policy terms are not statements of material fact. (Mot. Summ. J. ¶ 37-39.) The court disagrees.  As previously discussed, MEI did not have a duty to read the policy.  Moreover, the existence of a cause of action against an insurance agent for misrepresenting the terms of a policy is well established.  *See e.g. Rainey-Mapes,* 729 S.W.2d at 913-14.

### E. Fiduciary Duty

Insurance Concepts moves for summary judgement on MEI's breach of fiduciary duty claim on the grounds that MEI has not introduced evidence of a confidential relationship.  The court agrees.  As the Texas Supreme Court stated in *Crim Truck and Tractor*, "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." 823 S.W.2d at 594.

### F. Breach of Contract

Insurance Concepts claims to be entitled to judgment as a matter of law on MEI's breach of contract claim because no valid contract existed between the parties. (Mot. Summ. J. ¶ 44.) Under Texas law, a binding contract is formed when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with

the intent that it be mutual and binding. *Am. Nat'l Ins. Co. v. Warnock*, 131 Tex. 457, 114 S.W.2d 1161, 1164 (Tex. 1938); *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.--Houston 2002). Consideration is also an element of every valid contract. *Critchfield*, 151 S.W.3d at 233.  To decide whether the parties have entered into an oral contract the court examines the "communications between the parties and . . .the acts surrounding those communications. *Id. quoting Prime Prods., Inc. v. S.S.I. Plastics, Inc*., 97 S.W.3d 631, 636 (Tex. App.– Houston 2002).  Here the facts of this case could support a jury finding that the parties reached an agreement whereby, in exchange for a commission on its premium payments, Insurance Concepts agreed to suggest and procure insurance for MEI.  (*See generally* Muniz Aff.)

       *G. Insurance Concepts Requested Conclusions of Law.*

       In Insurance Concepts' reply to MEI's response to Insurance Concepts' motion for summary judgment, Insurance Concepts requests, for the first time, two conclusions of law. (Reply ¶ 4.)

       First, Insurance Concepts seeks a conclusion of law from this Court that,[sic] the Aspen policy would not have covered [MEI's] scope of operations,[sic] because Muniz admits that Lock-out Tag-out procedures were never part of its scope of operations.  Second, Insurance Concepts seeks a conclusion from this Court that as a matter of law,[sic] the language "currently providing technical, management and administrative services to NASA, the Department of Defense, and major aerospace companies," would not have afforded coverage under the [Dakota] policy for lock out tag out procedures.

(Reply ¶ 4.) The court declines both invitations.  Insurance Concepts' first suggested conclusion of law is nonsensical; its second, speculative.

IV. <u>Conclusion</u>

       For the aforementioned reasons, it is ORDERED that Third-Party Defendant Insurance Concepts' Motion to Dismiss (Dkt. 75) is DENIED. It is further

ORDERED that Third-Party Defendant Insurance Concepts' Motion for Summary Judgement (Dkt. 74) is GRANTED-in-part and DENIED-in-part.  Specifically, Insurance Concepts motion for judgment as a matter of law on MEI's claim for breach of fiduciary duty is GRANTED.  Insurance Concepts' motion is otherwise DENIED.  It is further

ORDERED that Third Party Plaintiff MEI's Objections to Third Party Defendants' Proffered Evidence in Support of Its Motion for Summary Judgment and Motion to Strike is DENIED.

Signed at Houston, Texas, this 30th day of March, 2007.


MELINDA HARMON
UNITED STATES DISTRICT JUDGE